## Killpatrick *versus* Frost et al.*†

1. The judicial competence of the Circuit Court of the United States, does not depend upon the description of the parties, as belonging to the different States, but upon the fact that they do so belong.

2. The process, being sufficient to justify the marshal acting under it, was sufficient for the protection of the other defendants who were acting as his aids, and they need not prove any formal deputation.

3. The marshal having shown his commission, and also his recognition by the Federal courts, as marshal, this court presumes that he has in all other respects, conformed to the law, so far as conformity is essential to the offering of his commission in evidence.

ERROR to the Court of Common Pleas of *Erie county*.

This action was trespass for assault and battery and false imprisonment of plaintiff. The defendants, Sproul and Reynolds, having by force taken the plaintiff from his home, on his farm, in Erie county, to Allegheny City, where, being joined by the other defendant, Frost, he was forcibly taken by them to the jail in the city of Pittsburgh, and there confined for a period of over twenty days.

On the 2d of December, 1853, a bill in equity was filed in the Circuit Court of the United States, for the Western District of Pennsylvania, to May Term, 1854, in the name of the Buffalo and State Line Railroad Company, as plaintiff, in form, against the Erie and North East Railroad Company, the city of Erie, and John Killpatrick, *et al.*, setting forth,

" That the Buffalo and State Line Railroad Company, is a corporation erected by and duly organized under the laws of the State of New York, and doing business therein.

That the complainants are proprietors of a railroad extending from the city of Buffalo to the boundary line between the States of New York and Pennsylvania, in the direction of the city of Erie, forming a part of a thoroughfare of trade and commerce known as the Lake Shore Railroad Line.

That the complainants' railroad terminates at said boundary line between said States, from whence another road extends from the State line aforesaid to the city of Erie, known by the name of the Erie and North East Railroad, constructed and

---

* The Reporter feels that some explanation is due in relation to the large space appropriated to this case, but its importance, involving as it does to some extent, a conflict of jurisdiction between the State and Federal Courts, he deems sufficient. Younger members of the profession will be amply repaid by an examination of the arguments of, and extensive reference to authorities by the learned counsel upon this important question.

† Mr. JUSTICE THOMPSON having been concerned in this case in the court below, took no part in its adjudication in this court.

[Killpatrick *v.* Frost et al.]

owned by the Erie and North East Railroad Company, a corporation erected and organized under the laws of Pennsylvania, and being situated and doing business in said State.

That in order that the profits of said railroads might be increased, and the benefits of a continuous line of railroad between the cities of Buffalo, Erie and Cleveland, might be secured to the stockholders of said roads so meeting at the city of Erie, and said boundary line of said States, an agreement was, upon the 14th of November, 1853, made and entered into by and between the complainants and said Erie and North East Railroad Companies, and duly executed by said companies on the 17th of November, 1853, the copy whereof in the said bill sets forth:

That by said contract the complainants, and the Erie and North East Railroad Company, agreed, each with the other, to work and run their roads together as *one road*, from Buffalo to Erie, upon the terms following :—

1. The gauge of the Erie and North East Railroad shall be changed to conform to that of the Buffalo and State Line Railroad, at the cost and expense of the two companies, in the ratio of the present cost of each road.

2. The roads to be run under the direction of one superintendent, to be appointed by the joint action of the Board of Directors of the two roads, but removable at the instance of two-thirds of the directors of either company, and C. C. Dennis was appointed in the contract to hold, until superseded by appointment, under the provisions of the agreement.

3. A common treasurer, appointed and removable in the same manner as the superintendent, to receive the gross earnings of the said roads, out of which are to be paid the running expenses of both roads, including the salaries and wages of all persons employed, and all damages to persons or property; the cost of all new machinery and running stock necessary for the use of the roads, and also the accruing interest upon the debts of both companies, and of all repair shops, engine and car houses, station buildings, tools and materials necessary for the roads. And the *residue* of such gross earnings to be divided between the companies in the ratio of the cost of each road.

4. The present running stock adapted to the use of the roads to be appraised at its value, in cash, at the time of taking effect of this agreement; and at the termination thereof, the company furnishing it shall receive the same kind and value, and the balance shall be divided between the two companies in the ratio of the cost of each road. The running stock of the Erie and North East Company now on hand, and not suited for use on both roads, to be sold by the superintendent, and the proceeds to be deducted from the cost of that road.

5. At the expiration or dissolution of this agreement, each

[Killpatrick *v.* Frost et al.]

party to take, at the cash appraisement, the shops, engine and station houses appertaining to its road, and erected under the provisions of this agreement, and pay to the treasurer such value, and the same shall be held and applied as other moneys received under the agreement.

6. The roads to be run by the superintendent, under the direction of an executive committee of two, one appointed by each party; and this committee shall also prescribe the mode of keeping the accounts, and the keeping and disbursing of all money and all other matters growing out of the agreement.

7. And one engine house and such repair shops and station buildings as are deemed necessary by said committee for the use of the two roads, shall be erected at Erie as early as possible.

9. If deemed advisable by both parties, the two companies may create a debt to pay for repair shops, engine and car houses, instead of applying thereto the earnings of the roads.

10. In case the net earnings are not, or only sufficient to pay seven per cent. interest on the cost of the two roads, then they shall be divided between the two companies in proportion to the cost of the respective roads.

11. During the continuance of the agreement, neither party shall purchase or sell any real estate without the consent of the other.

12. Dividends shall be made to the stockholders of each road, on the first day of February and August, annually, but not exceeding five per cent. on the first of February next. And this agreement to be binding and operative upon the parties, from the date thereof, and continue and be in force for two years from the 10th of February, 1854."

The bill then charged, "that the said Erie and North East Railroad Company have not made the change in the gauge of their road, by them agreed to be made as aforesaid." And then charged, that the city of Erie combined and confederated with divers persons, afterwards therein named, citizens of Pennsylvania, and divers other workmen, but when known or discovered, to be made defendants, for the purpose of hindering or preventing the said change of gauge from being made; and by force, violence and fraud, to hinder and prevent the execution and performance, by the Erie and North East Railroad Company of their agreement and contract with complainant. And that in anticipation that said Erie and North East Railroad Company would change their gauge, as authorized by the recited Act of Assembly, the authorities of said city of Erie passed an ordinance to prevent said last named company from changing the gauge of their said road, and also resolutions of like import about the time of making said contract between the same com-

panies; and, likewise, after the said contract was consummated in furtherance of said confederation, the said city resolved to prevent the said Erie and North East Railroad Company from changing said gauge, and to that end authorized and instructed the mayor of said city to detail a sufficient force of men for that purpose. That this ordinance and these resolutions were passed and adopted by certain persons named, and who are averred to be citizens of Pennsylvania, and made defendants, and in pursuance of said ordinance and resolutions, the mayor of said city appointed certain persons named, a special police, to enforce the same; and that to the same end, the military force, under command of John Killpatrick, and others, has been called into said service by said mayor. And that said John Killpatrick, and others named, combining and confederating with said city, for said purpose, had met together and had resolved as their design and intention, to comply with said request of said mayor, and did tender to him their services for that purpose, and that they are citizens of Pennsylvania.

The bill then prayed for a decree of specific performance against the Erie and North East Railroad Company, in relation to their contract to change the gauge, and for a special injunction against John Killpatrick and others, to prevent interference on their part.

Upon this bill being filed, *subpœnas* and notices were ordered by the Circuit Court, accordingly, requiring appearance of defendants on the first Monday of January, 1854, for general answer to the bill, and the notices to appear on the 12th of December, 1853, and answer the motion for said injunction.

Afterwards on the 12th of December, 1853, the complainants filed a supplemental bill, setting forth that after filing the former bill, and after service of *subpœna*, and notice of injunction in the case on the city of Erie, and the mayor and councils, that is to say, on the 5th of December, and subsequently, the said defendants named in the original and supplemental bill, further combining and confederating for the purposes charged in the original bill, did proceed with force and violence, noise, tumult, and outrage, to break down, demolish and destroy and injure the bridges erected over the streets of said city, by the Erie and North East Railroad Company, for their railroad, and tore up, removed, injured, and destroyed the rails and superstructure of the same, in the corporate limits of said city, injuring, and wantonly destroying property of great value, and hindering and preventing the passage of cars and locomotives over, and along said railroad, and interrupting and preventing the transportation of freight and passengers over, and upon said railroad, and preventing the performance of the contract and agreement, in the original bill referred to, and set forth. And that said defendants

threatened, and continued to threaten, that they will tear down, injure, and destroy the depots, engine-houses, buildings, and appurtenances of said Erie and North East Railroad Company at Erie, and further prayed for a preliminary injunction.

On the same day the cause came on before the court, for hearing, on the motion for this special or preliminary injunction made by the complainants, *ex parte*, and afterwards on the 17th of the same December, the court ordered that an injunction issue, and stand till further order.    Afterwards on the 5th of January, 1854, *ex parte* proof having been made to the satisfaction of the court, that a breach of the injunction had been committed by persons, on whom the same had been served, made an order that the marshal see that the injunction be enforced, and make report of all persons that may resist the *repair* of said railroad, and the use thereof.    And a mandate was issued to the marshal reciting the order, and that its purpose and object was to prevent interference with the repair of said railroad, and the use thereof in Erie, Harbor Creek, and elsewhere.

There was no appearance for the defendants entered, nor even filed by them in the case, until the 11th of April, 1854, when a demurrer was filed to the complainant's bill, for want of jurisdiction in the court, *inter alia.*

The notice of the motion to be made or heard on the 12th of December, 1853, for the injunction prayed for, and in the meantime to "refrain from doing any act against the railroad of the Erie and North East Railroad Company," was returned by defendant Frost, " served on John Killpatrick, by leaving a copy at his dwelling-house with his mother, on the 6th of December, 1853."

The preliminary or special injunction was awarded on the 17th, and issued on the 19th of December, 1853.    This was returned, served on John Killpatrick and other of the defendants, on the 21st day of December, 1853, but how it was served, does not appear in the return of the marshal.    On the 4th of January, 1854, the affidavit of Westley Frost, one of the defendants in this case in the court below, was made and filed, setting forth that on the 2d of the same January, he served upon John Killpatrick personally, by copy, the following notice directed to him from the counsel or solicitors of the complainants in the bill.    "To John Killpatrick ; you are hereby notified, that on Thursday, the 5th of January, 1854, the court will be moved for an order that you stand committed for a contempt of said court, upon certain charges then and there to be alleged against you in this cause, on the 17th of December, 1853, and which breaches and charges are here stated as follows :  ' That on the 21st of December, 1853, after the service upon you by the proper officer of a copy of said injunction, to wit, in the township of Harbor Creek, in the

county of Erie, and Commonwealth of Pennsylvania, you were engaged in tearing up and destroying the track of the Erie and North East Railroad, and were then and there aiding and encouraging others in the destruction of said railroad, for a great length or distance to wit, ten rods.'" This notice was entitled " *The Buffalo and State Line Railroad Company* v. *The City of Erie and others*. In the Circuit Court of the United States, Western District of Pennsylvania, in chancery:" and dated Pittsburgh, December 28, 1853.

On the 5th of January, 1854, upon the proof of service of the notice as before stated, by the affidavit filed of Westley Frost, and upon *ex parte* proof submitted on the behalf of complainants, "touching the contempt of this court, by John Killpatrick and other defendants charged in the motion, and the court having adjudged him and them guilty of a breach of said injunction and of the contempt alleged in said motion, the court order that said John Killpatrick and others, for the said offence be committed to the jail of Allegheny county, in the Western District of Pennsylvania, during the pleasure of said court, or until discharged by due course of law." This order was made *ex parte* entirely, and in the absence of these defendants, and so appeared of record, and upon the mere motion of complainants' counsel, for the reasons given or stated in the aforesaid motion given by them. A warrant of arrest was then issued to the marshal of the District, against said John Killpatrick and these other defendants, in due form reciting the previous proceedings in the court, the cause for, and manner of making the order of commitment as before stated, and then proceeded with a command therefor to the marshal of the district, to assist and take into custody John Killpatrick and others therein named, and commit them to the jail of Allegheny county, and also, enjoining the sheriff and jailor thereof, to keep them during the pleasure of the court. This warrant was signed, " Thos. Irwin, Dist. Judge, U. S."

The defendant set up these proceedings and this warrant, in justification of the alleged trespass and imprisonment. But the plaintiff contended that the Circuit Court had no jurisdiction in the premises; that the jurisdiction claimed, did not only not appear, but the want of it was manifest from the record: and that the warrant gave no authority whatever, to arrest the plaintiff.

On the trial, defendants having given in evidence, the record and a commission to Westley Frost, dated March 24, 1853, appointing him marshal, without anything further, offered a paper purporting to be a general deputation by Westley Frost of defendant Sproul, dated April 1, 1853, and proved by their counsel in the case, as follows : "I have never seen Westley Frost

write; I only know his handwriting from correspondence with him in this suit, and on the subject of this, and on no other business; his name subscribed to this paper, I believe to be in his handwriting." The plaintiff objected to the reading of this paper in evidence, without further proof. The court, however, overruled the objection and received the evidence, and for plaintiff, sealed an exception thereto.

There was no evidence that Westley Frost had ever been qualified as marshal by giving bond, or that either he or his alleged deputy, had taken any oath of office as required by act of congress, before entering upon their official duties. It was proved by plaintiff, that defendants said at the time of arrest, or while on the way to prison, in refusing a request for some personal comfort or refreshment, that the railroad companies had already complained, that they had extended too much lenity to plaintiff, and they were indemnified by them.

On the trial, plaintiff requested the court to charge the jury as follows:—

"1. To enable the defendants to justify or excuse this trespass alleged against them, under color of the office of marshal, the exhibition of the commission alone is not sufficient; it must in addition, be proved affirmatively, that the holder of it was at the time duly qualified, by having given the security and taken the oath or affirmation required by law, for until this be shown, the holder of the commission is not authorized but really prohibited by the act of congress, to execute any process of the court.

2. That to enable the defendant, Sproul, to justify or excuse himself, his previous due appointment and qualification must be shown; and the mere exhibition of the deputation now in evidence, being but the act of the defendants themselves, without any evidence of its existence previous to this suit, or the acts attempted to be justified or excused by it, without any evidence of his having accepted the same, and taken the oath required by law, affords no protection to him in this action.

3. The process of the Circuit Court, under which the defendants claim protection, is of no validity whatever, for that purpose, unless it also appear upon the face of the record, that the court had jurisdiction in the case.

4. That the court issuing this process or mandate, is one of limited jurisdiction, and consequently the presumption of law is against the jurisdiction; and the existence of it in this particular case, must be shown affirmatively; it cannot be inferred or presumed.

5. If the Buffalo and State Line Railroad Company, and the Erie and North-East Railroad Company were partners, or *quasi* partners, in the subject-matter of the bill and proceedings in the Circuit Court, or jointly interested therein, and that appeared

[Killpatrick v. Frost et al.]

upon the face of the record, then the court was without jurisdiction in the premises, and the process issued thereon was a nullity, and affords no protection to the officer executing it.

6. It does appear upon the face of the bill referred to in the preceding point, that these two corporations were the real parties complainants therein, and that the same was introduced and carried on for their mutual advantage; and it also appears on the face of the bill, that the one corporation was created by the laws of Pennsylvania, and located and doing business therein, and that therefore the court had no jurisdiction to entertain the bill, nor issue process thereon.

7. That it not being averred in any part of the record, that the corporators or stockholders of the Buffalo and State Line Railroad Company, are citizens of New York State, nor that they are not citizens of the State of Pennsylvania, the jurisdiction does not appear, and therefore must not be taken to attach; and the process set up by the defendants affords them no protection.

8. The omission in the supplemental bill, to aver such circumstances as give jurisdiction to the court, is not cured by any reference to the original bill; and inasmuch as the injunction, and the process thereon, appears to have been issued for acts against matters and things charged solely in said supplemental bill, the jurisdiction is wanting, and the process thereon a nullity.

9. If the court had no jurisdiction in the particular case, the process was a nullity,—affords no protection to defendants,—and that the question of jurisdiction was a doubtful or difficult one to determine, does not defeat the plaintiff's right of action; and more especially is this so in this case, where it appears that the defendants were indemnified by the plaintiffs and complainants in the proceedings."

Defendant asked the following instructions to the jury:—

"1. That the Circuit Court of the United States for the Western District of Pennsylvania, had jurisdiction of the bill or proceedings in equity, instituted by the Buffalo and State Line Railroad Company, a corporation of the State of New York, against the Erie and North-East Railroad Company, the City of Erie, and others of the State of Pennsylvania, which bill, and the proceedings thereon, have been given in evidence in this suit.

2. That the Circuit Court of the United States for the Western District of Pennsylvania, having jurisdiction of the bill in equity, instituted in that court by the Buffalo and State Line Railroad Company, a corporation of the State of New York, against the Erie and North-East Railroad Company, the City of Erie, and others of the State of Pennsylvania, the process, order, or execution, issued by the court upon that bill, com-

manding Westley Frost, the marshal of the Western District of Pennsylvania, to arrest and commit to the jail of Allegheny county, the plaintiff in this suit, is a full and entire defence and justification to the defendant, Westley Frost, the marshal of that district, to I. Greer Sproul, his deputy, and to Alvah Reynolds, his assistant, in arresting and committing to jail, in Allegheny county, the plaintiff in this suit."

The court, GALBRAITH, J., charged the jury as follows:—

"The evidence proves, that in the month of January, 1854, the defendants caused the plaintiff, with others, to be arrested and conveyed to the jail in Pittsburgh, and delivered him to the keeper, in consequence of which he was detained there for some three or four weeks, and subjected to the payment of costs, before he could be discharged. In justification, the defendants rely upon certain proceedings in the Circuit Court of the United States for the Western District of Pennsylvania, and an order from that court, commanding the arrest of the plaintiff, and three others with him. In pursuance of this order, directed to the defendant, Frost, as marshal of the Western District, the plaintiff was arrested.

The defendants produce the record of a certain writ in the Circuit Court of the United States for the Western District of Pennsylvania, being a bill in equity, No. 2, of May Term, 1854, in the name of *The Buffalo and State Railroad Company* v. *The Erie and North-East Railroad, John Killpatrick, the plaintiff, and others*, and praying for an injunction against tearing up the railroad track on the Erie and North-East Railroad, and setting forth a contract between the latter and former roads; the record shows that an injunction was decreed; that there was an alleged disobedience of that order on the part of the plaintiff, and which being made to appear in that court, an attachment for contempt was issued by that court, and placed in the hands of the marshal, in pursuance of which, the arrest was made, and for the execution of which, this suit was brought.

The points in this case, have been very extensively as well as very ingeniously argued on both sides, and we have been entertained and instructed in the argument, and although a number of points have been put, they are all really resolvable to two; the one involving the jurisdiction of the court, and the other the authority of the marshal. It has been urged in argument, that the Circuit Court is a court of limited jurisdiction. It is so, so far as the object is concerned, but when the object matter brought before it, is within its jurisdiction at all, it is superior to the State court; and, on the question of its own jurisdiction, it is superior, that is, it is not amenable to the State court, nor subject to the correction of the State court; but, if the Circuit Court should commit an error, that error cannot be corrected

[Killpatrick v. Frost et al.]

by the State court, but by appeal to the Supreme Court of the United States. It is argued here, that there was unfairness in introducing the Erie and North-East Railroad Company as a defendant, when it was, in fact, a co-operator with the Buffalo and State Line Railroad in pursuit of the plaintiff. If that were so, it was for the court of the United States to determine, and not for the court here, and was a question exclusively for the United States court to determine. In answer, therefore, to the plaintiff's first point, we do not say precisely in the language of that point, that the Circuit Court of the United States had jurisdiction of the bill and proceedings, but it had the right to determine the question of jurisdiction, and this court has no right to determine otherwise. The second point of defendant, is decided in the affirmative, and the determination of this point is really decisive of all there is in the case in favor of the defendants.

The first point of the plaintiff, is certainly very plausible at first blush; the act of congress does require, that the security must be given and oath administered, before the marshal is authorized to act, and it would never do to require that this should be done independent of the commission, but this being under an act of congress, it is for the United States court and not this court to determine its true construction; the point is therefore decided in the negative.

The second point is also determined in the negative. The third and fourth points are also decided in the negative, for reasons set forth in general charge. The fifth point involves the question of action by the Buffalo and State Line Railroad with the Erie and North-East Railroad Company, and asserts a combination between those companies, as it is said, apparent on the face of the proceedings; if so, it is plausible, but, at the same time, it is for the court in which the bill is filed to determine, and not for this court in a collateral way; this determines the fifth and sixth points in the negative. The seventh and eighth points, depending on the same principles, are also determined in the negative.

The ninth point is determined on the general principle in the negative, and the circumstance of the defendants being indemnified can make no difference.

As to the deputation to the deputy, it is not, we think, material, whether sufficiently proved or not; it is not doubted, that as well he as Mr. Reynolds, acted under direction and recognition of the marshal, and if so, it is not for the plaintiff to complain that the deputation was not in strict conformity with the letter of the law.

This disposes of the whole case, therefore, in favor of the defendants. We do not determine, whether in abstract princi-

VOL. II.—12

[Killpatrick *v.* Frost et al.]

ple, the Circuit Court of the United States had jurisdiction or not, but simply that the court exercised the jurisdiction, and as far as this court is concerned, have decided it; and that is conclusive so far as this court is concerned."

The plaintiff's counsel except to this charge, and assigned the same for error.

*Church*, for plaintiff in error.—The questions involved in this cause may be reduced to that of the jurisdiction of the Circuit Court in the premises, and the right of the defendants, who arrested the plaintiff, to execute its process. The Circuit Court of the United States is a tribunal of *limited* jurisdiction, and consequently there can be no presumption in favor of it. Indeed the authorities show the presumption to be, that a cause is *without* the jurisdiction of that court, unless the contrary appears of record. 4 Dall. 11; Conk. Treat. 142, 369; 8 Pet. 148, (11 Cur. 53.) See also 8 Pet. 112, (11 Curt. 41.) There must be an averment of citizenship of the parties. 3 Dall. 383; 1 Cran. 343, (1 Curt. 422.) But this averment in the title of the bill, is insufficient. 2 Cran. 9, (1 Curt. 427.) Nor is it sufficient in the body of the bill, if done by way of recital, as by styling the party "of the State," &c. 2 Cran. 9, and 8 Pet. 148. So it is under the act of congress, conferring the jurisdiction upon, or creating the Circuit Courts; the *amount* in controversy, as well as citizenship, must appear of record; it must be averred of record. The language of the act, (Brightly's Dig. U. S. L. 1, 6, § 17,) is explicit as to citizenship, and amount in controversy: "The Circuit Courts shall have original cognizance concurrent with the courts of the several States, of all suits of a civil nature at common law or *in equity*, where the matter in dispute exceeds, exclusive of costs, the sum of $500, * * and the suit is between a citizen of the State where the suit is brought, and a citizen of another State." By the plainest analogy, therefore, the averment of the amount in controversy is necessarily as essential to give jurisdiction, as the citizenship of the parties. 4 Wash. C. C. R. 624; 1 Paine, 586. The case in Wash. Rep. was an ejectment, and the defendant moved to dismiss the suit, because the want of jurisdiction appeared on the face of the proceedings, the value of the matter in dispute not being averred, and cited the act of congress in question. Justice Washington, in delivering the opinion of the court, deems the question "settled *in principle* by the adjudications of the Supreme Court." And he announces these as adjudicated principles governing the case. "1st. That the Circuit Courts are courts of limited jurisdiction. 2d. That they are the *creatures* of the legislature, and can exercise no jurisdiction but what is conferred upon them by congress. 3d. That as courts of limited jurisdiction, their pro-

[Killpatrick *v.* Frost et al.]

ceedings are erroneous, unless the ground of jurisdiction be stated in the pleadings. If it be not, the presumption of law is that the court has not jurisdiction of the case. The character of the parties giving the jurisdiction must be positively averred of record, as already seen. But the amount or value of the matter in dispute is as essentially a ground of jurisdiction as the character of the parties, and no reason why the citizenship must be averred can be given, that does not apply with equal force to the amount in controversy, or value of the matter in dispute." Thus it was, that learned judge, assisted by one little inferior, after full discussion by the most learned counsel at the Philadelphia bar, adjudicated this question. The case of *Ex parte Bradstreet,* in 7 Peters, will be found, on examination, not to affect the question involved in this case.

The plaintiff then claims, that the Circuit Court had no jurisdiction on the two grounds already indicated, and that this want of jurisdiction was apparent from the record. It is not denied that a corporation aggregate, averred of record to have been created by the laws of New York, and to have its *principal* place of business there, can sue a citizen of Pennsylvania in the Circuit Court of the United States; for although the Supreme Court of the United States has repeatedly decided otherwise, 1 Pet. 238, (7 Curt. 551;) 5 Cran. 47, (2 Curt. 200;) yet the present ruling of that court maintains the jurisdiction. 18 How. 404. But protesting that the averment made by the Buffalo and State Line Railroad Company, in their bill and supplemental bill, is insufficient to support the jurisdiction claimed, the plaintiff contends that it appears upon the face of these bills, that the Erie and North-East Railroad Company is really a joint-plaintiff in interest therein, and that the governing rule of the authorities is, that unless each of several joint-plaintiffs, or those appearing to be such in interest on the record, are capable of suing each of the joint defendants in the same court, there is no jurisdiction. 3 Cran. 267, (1 Curt. 575;) 1 Cran. 61, 303, (2 Curt. 194, 273;) 2 Whart. 91, (3 Curt. 476.) The question of jurisdiction is to be tested, especially in equity, by the character of the real, instead of the nominal party; (Conk. Treat. 147, 152, 161;) and this rule is not changed or affected by the supplemental judicial Act of 1839. 14 Pet. 60, (13 Curt. 346.) So where a corporation is to receive an advantage from a decree in equity in favor of the nominal complainants, or will suffer a disadvantage from a decree adverse to such complainants, and so appears on the face of the record, it is the same on the question of jurisdiction, whether such corporation is in form a plaintiff or defendants; the real interest, especially if it be apparent from the record, governs. *Northern Indiana Railroad Company* v. *Michigan Central Railroad Company,* 15 How. 233, 245, (20

Curt. 485, 486, 490.)   The record here upon its face shows most manifestly, that the Buffalo and State Line Railroad Company, and the Erie and North East Railroad Company, are in joint interest as plaintiffs in the proceedings, and that the making the latter company a nominal defendant is colorable and not real—a transparent mockery.   To discover that this allegation is well founded, requires but a fair and plain reading of the bills, and the proceedings thereon up to the time of the arrest and imprisonment of this plaintiff.   Indeed, all that makes the Erie and North-East Railroad Company a defendant, is the language of the complainants, thus: "And the said Erie and North-East Railroad Company are made defendants hereto," while everything else in the record shows the interest of the two railroad companies in the premises to be joint and equal.

In the commencement of the bill, it is averred that the two roads form a thoroughfare for freight and passengers, and are run together, and in consequence of want of uniformity of gauge, the *value* and *profits* of the *two* roads to the *proprietors* thereof, are greatly impaired and diminished ; then, that the Erie and North-East Railroad Co., are authorized to change the gauge of their road ; then, to increase the profits of said road, and to secure the benefits of a continuous line to the stockholders of the *two* roads, the agreement of partnership was entered into between them on the 14th, and executed on the 17th of November, 1853, which was before the filing of the bill.   And if anything more be wanted to complete the showing of unity and harmony of interest, between the two railroad companies, it is found in this contract itself, as embraced in and made part of the bill.   The gauge of the Erie and North-East Railroad, is to be changed at the mutual expense of the two companies, borne by them at a given ratio.   The two roads are to be run under the direction of one superintendent, jointly chosen by the contract itself; the gross earnings of the two roads, to be received by a common treasurer ; but out of that common fund the running expenses are to be paid ; and equal *limited* dividends to the stockholders of both companies, as well as the cost and repairs necessary for both roads.   And the residue of these gross earnings, it is expressly provided, shall belong to the two companies in a stipulated ratio.   So, also, of the running stock of the two roads.   Then it is also further provided, in said agreement, that at the "*dissolution*" thereof, the buildings, &c., appertaining to each road, and erected under the agreement, shall be taken by the respective roads at their appraised cash value, and pay to the treasurer appointed under the agreement, such value, and these proceeds applied as any other moneys received under the agreement.   An engine house and repair shops, as deemed necessary by the executive committee of the two roads, are to

be erected at Erie for the joint use of the roads.  And neither party shall sell any real estate without the consent of the other.

If these and the like provisions in the agreement, do not form a complete partnership and joint interest, in all relating to the premises, it is impossible to find language that would.  It is to take effect from the date thereof, which as we have seen, was long previous to filing the bill.  But the bill on its face, expressly avers that the performance of the agreement is and will be promotive of the interests of both companies, and that the city of Erie, combined with divers persons named, of whom the plaintiff in this suit is one, and with divers persons unknown, by force, violence and fraud, to hinder and prevent the execution and performance of said agreement.  And it is not averred in the bill, or elsewhere of record, that the Erie and North-East Railroad Company, have refused to perform said agreement, but only that the performance thereof has been by force, violence and fraud, on the part of the City of Erie, and said Killpatrick and others, (not, however, including said Erie and North-East Railroad Company,) prevented and rendered impossible.  And the bill concludes, by praying that they be restrained from interfering with said Erie and North-East Railroad Company, and from preventing the same from performing said agreement, or any part of it, and enjoined and required to desist from enforcing the ordinances of said city, requiring the removal of said railroad from the streets thereof, and from bringing any action against said Erie and North-East Railroad Company, its stockholders, officers or agents, to prevent the performance of the recited agreement between the two companies.

Special attention to the main material features of the bill, has thus been here devoted, for the purpose of showing the joint interest both companies manifestly have in the premises, as the real complainants.  And hence the case is brought directly within the principles of the authorities already cited, declaring the want of jurisdiction.  Indeed, it seems impossible, by any fair construction of the language of the bill, to avoid the conclusion, that the Erie and North-East Railroad Company is the *real* party plaintiff, although nominally a defendant.  And this corporation company appearing on the face of the bill to be a *quasi* citizen of Pennsylvania, the want of jurisdiction in the Circuit Court is manifest from the record on this ground, in addition to that arising from the absence of any averment or showing that the matter in dispute exceeded the sum or value of $500.  The court having no jurisdiction, the whole proceeding is *coram non judice*, the process a nullity, and the officer executing it a trespasser.  *Wise* v. *Withers*, 3 Cran. 331, (1 Curt. 597.)  The case here cited was a very peculiar one.  The action was trespass, and de-

fendant justified under a process for collecting militia fines, and plaintiff said he was not subject to such fine, and the court adjudged in favor of plaintiff, because the court which had adjudged the fine had no jurisdiction, and that consequently the officer executing its process, was a trespasser. Such, also, is the doctrine of all the adjudged cases; Willes, R. 128, 689; 2 Blackf. 429; 3 Id. 421; Cowp. 18; 2 East, R. 260; 2 Wheat. Sel. N. P. 932, 933; 5 Wend. 130, 131; 12 Johns. 257. That the question of jurisdiction was a doubtful one to determine, can make no kind of difference, except, perhaps, in mitigation of damages. What is doubtful or difficult of solution or determination to one, may be otherwise to another. But the remarkable error of the court below, was in supposing that the mere fact that the Circuit Court exercised the jurisdiction, was conclusive on the question, so far as the plaintiff here is concerned. The charge of the court on this subject is clearly at variance with the whole science of our judicial system, and contrary to all adjudicated authority. 1 Peters, R. 328, 340, 341. The opinion of the court in the case here cited, covers the whole question in the following language used: "When a court has jurisdiction, it has a right to decide every question which occurs in the cause; and whether its decision be correct or otherwise, its judgment until reversed, is regarded as binding, in every other court. But if it act without authority, its judgments and *orders*, are regarded as nullities. They are not voidable, but simply void, and form no bar to a recovery sought, even prior to a reversal, in opposition to them. They constitute no justification, and all persons concerned in executing such judgments or sentences, are considered in law, as trespassers. This distinction runs through all the cases on the subject; and it proves that the jurisdiction of *any* court exercising authority over a subject, may be inquired into in *every* court, when the proceedings of the former are relied on, and brought before the latter, by the party claiming the benefit of such proceeding." And the like doctrine is recognized by the same court in many subsequent cases. 2 Peters, 157; 6 Id. 95; 10 Id. 449; 13 Id. 498; 2 How. 398, 399; 3 Id. 495. In 6 Peters, 709, jurisdiction is defined to be a power to hear and determine a cause; then it is *coram judice*, when the petitioner so presents his case, that on demurrer for want thereof, it should be adjudged in his favor upon inspection of the record, but otherwise it is *coram non judice* and extra-judicial. 12 Pet. 718, 623. This, says Justice Baldwin, is the line which denotes jurisdiction and its exercise in cases *in personam;* where there are adverse parties, the court must have power over the subject-matter and the parties too, failing in either of these, the jurisdiction fails also.

But the plaintiff claims, that if jurisdiction did exist in the

[Killpatrick *v.* Frost et al.]

Circuit Court, on the face of the record, and if the process for the arrest and imprisonment might afford a justification to a duly qualified marshal, such officer *de jure*, it by no means follows, that defendants Sproule and Reynolds are entitled to the same immunity. For it must be remembered, that these latter defendants made the arrest nearly one hundred and fifty miles from the court and the marshal, and certainly, no subsequent recognition of their acts, by him or the court, could avail them in defence, unless it appear to have been made under a previous deputation, given by the marshal, qualified, consummated and completed, according to the act of congress on the subject. And the full affirmative of this in evidence, rests upon them. The rule of the authorities establishes the principle, that whenever a person claims a right as an officer, he must show himself to be such *de jure*, and especially must this be so, where a justification is set up for depriving a citizen of his personal liberties.

To show an appointment alone, is not sufficient; he must show that he was qualified, as provided by law. *Riddle* v. *Bedford Co.*, 7 S. & R. 393, 394; *Neele* v. *Overseers*, 5 W. 538; Bright. Rep. 426; 12 New Hamp. Rep. 587; 3 Scam. 483; 5 U. S. Dig. 465, § 20, 21; 15 Verm. 653; 4 Iredell, Rep. 355, 368. It is only "*lawful*" process that the marshal himself is authorized to execute; (Bright. Dig. U. S. L. 595;) and before entering upon the duties of the office, he shall give bond, &c., (Ib. 566,) and so shall his deputies; and before entering upon the duties of his or their office or appointment, they shall respectively take a prescribed form of "oath of office," limiting their authority to the execution of "*lawful process*," directed to the marshal, under the authority of the United States, well and truly, and without malice or partiality, and take only his lawful fees. See "Form of Oath," Ib. 596.

Now, when it is considered that the jurisdiction of the court, the authority of the marshal and his deputies, and, indeed, of the government itself, is limited and restricted, the importance of the application of that rule, which demands that the jurisdiction, the authority and power over the person, as well as the subject-matter adjudicated upon, shall appear affirmatively on the face of the record and proceedings, must be fully conceded, more particularly where the personal liberty of the citizen is involved.

It is conceded, that a court may have jurisdiction to hear, investigate, and determine a question of jurisdiction, and to punish for contempt of such exercise of jurisdiction. This is a jurisdiction necessarily incidental to all courts. But its exercise must be confined to such contempts as transpire in the presence of the tribunal. All courts have inherent power and authority to preserve order and decorum in their presence. But the au-

thority of an officer, or person assuming to be such, under a de-
cree or judgment of a court, whose jurisdiction is by law limited,
and not general, depends upon entirely different principles.
The process of the Circuit Court, here interposed in justifica-
tion of the defendants, is in the nature of an execution upon a
judgment pronounced by the court.   It is in the nature of final
process, both in substance and effect.   It therefore, follows, the
court must have jurisdiction, and that must appear affirmatively,
otherwise, by the authorities already cited, such process is a
nullity, and all concerned in its execution are trespassers.   But
it must not be forgotton, that these proceedings do not merely
omit averments necessary to give jurisdiction, but show affirma-
tively, that which takes it away.

A decree is defined to be a judgment of a Court of Equity;
(1 Tom. L. Dic., title Dec. p. 517;) and an injunction is a writ
in the nature of an execution, issued to enforce such order or
decree, to hinder and prevent, &c., (2 Tom. L. Dict. title Inj.
p. 197,) and is called a judicial writ; a process to enforce a
judgment.   1 Smith, Ch. 429; 2 Ves. Sr. 496; 2 Vern. 36; 1
Smith, Ch. 423, 425; 2 Id. 296.   Such a decree is a judgment,
sentence, or order of court, pronounced on hearing the points in
issue; (2 Danl. Ch. Pr. 1192; Bright. Eq. 529,) as may be a
decree for payment of money.   It is here the process of the
court only, that is alleged to have suffered the contempt.   It
must necessarily be so understood, for the Act of Congress of
March 2, 1831, (Bright. Dig. U. S. L. 189,) only authorizes
such contempts to be punished summarily, as are committed by
personal misbehaviour in presence of the court, (and which is
not pretended to be this case,) or " disobedience or resistance
by any party, &c., to any *lawful* writ or process, order, rule,
decree or command of the said court."   By the term " *lawful*,"
here used, must not be understood mere formality, or regularity,
for irregularities have been presumed to have been adjudicated
upon,—passed *in rem judicatum*—but this cannot be presumed
where there is no authority or jurisdiction in the tribunal, over
the subject-matter adjudicated.   It cannot, then, upon any
principle, be said to have passed *in rem judicatum*, because it
is *coram non judice*.   This commitment process, then, being
nothing more than an execution process upon a decree, which is
a judgment, the regularity of the judgment, or process, is noth-
ing; (2 Cas. 9;) but the jurisdiction which is the *sub tratum*,
is everything.   7 Wheat. 43, 44; 5 Curt. 213.        s

The judgment of the court is, that this plaintiff refrain from
interfering with, or hindering the Erie and North-East Railroad
Company, from, &c.   The allegation and the adjudication was,
that he had interfered and hindered, and, consequently, is subject
to the penalty of commitment.   Now, " a void judgment is no

judgment at all," say the authorities, and "every judgment is void, which appears, on the face of its own record, to have been pronounced by a court without jurisdiction or authority, over the person, or subject-matter of the judgment." And it may not be unworthy of observation here, that the United States Supreme Court, is the only court deriving its jurisdiction immediately from the United States Constitution. All the other courts of the national government, possess only the jurisdiction given them by the power of congress, which creates them. 7 Cran. 33 ; 2 Curt. 446. When it is said, that every judgment must be held conclusive, until reversed, it is invariably implied and understood, only of a judgment on a subject within their jurisdiction. No others are such, in any legal sense whatever, but merely nullities. Hence, it was ruled, in Mod. Cas. 16, 2 Tom. Dic. tit. Inj. 199, that if an injunction be granted by the Court of Chancery, in a criminal matter, the Court of King's Bench might disregard and break it, and protect any one that proceeds in contempt of it. And this is so, because the chancery jurisdiction did not extend to that subject-matter. But the plaintiff is not required to go so far here, in support of his right of action. He does not ask this court to interfere with the process of another, but to hold those executing its process, to an accountability for everything beyond their jurisdiction in the premises. It is a material consideration, says Justice Black, in delivering the opinion of this court, in *Williamson's case,* 2 Casey, that the warrant was a legal one on its face, authorized because the act of congress gave power to all the United States courts, to issue *habeas corpus,* when essential to the execution of their jurisdiction. So it might be said in relation to any disobedience to a *subpœna,* because they have an inherent jurisdiction over all *subpœnas.* The case in 10 Wheat., cited in 2 Casey, is wholly unlike this one in principle, and has really no analogy to it.

The question presented by this case, when fully understood, assumes a high importance. The principles of the case involve the true construction of the system of our national judiciary, the doctrine of State sovereignty, and the independence of the judiciary of the several States.

The Constitution, and the enactment of laws under it, have set limits to the jurisdiction of the one, and declare that all which is not expressly given to the national tribunal, is expressly reserved to, and retained by, those of the States. The perpetuity of the whole, depends on strictly confining the former to their well-defined limits.

*Walker,* for defendants in error.—Though the plaintiff has assigned fourteen errors, yet in his argument, he says they

"may be reduced to that of the jurisdiction of the Circuit Court in the premises and the right of the defendants, who arrested the plaintiffs, to execute the process." The judge below, in his charge, says: "Although a number of points have been put, they are all really resolvable to two: the one involving the jurisdiction of the court, and the other, the authority of the marshal." The two points made by defendants, and answered affirmatively by the court, maintain the same position. Indeed, it is only necessary to take even a hasty view of the facts and the law of the case, to bring the judicial mind to the same conclusion. For this reason, there is embodied in the defendants' statement, enough of the bill in equity given in evidence, to bring the facts before the court.

That the Circuit Court of the United States had jurisdiction in the case, upon which the attachment issued to arrest the plaintiffs, is settled by repeated adjudications in the Supreme Court of the United States. And this, though the Circuit Court is a court of *limited* jurisdiction. To give that court, in a case like the one presented by the record given in evidence, jurisdiction, the Constitution says, the suit or bill must be "*between citizens of different States.*" The judiciary act confers on the court jurisdiction "in suits between a citizen of the State where the suit is brought, and a citizen of another State." That a corporation is a citizen, within the meaning of the Constitution, and the judiciary act, is *now* settled by repeated adjudications. In the case of the *Bank of the United States* v. *Deveaux et al.*, 5 Cranch, 61, the court decide that "a corporation aggregate, composed of citizens of one State, may sue a citizen of another State in the Circuit Court of the United States." This was ruled, Marshall, C. J., giving the opinion, by the whole court, in 1809.

In the case of the *Louisville, Cincinnati and Charleston Railroad Company* v. *Thomas W. Letson*, 2 How. 497, decided in 1844, the whole court ruled, after full argument, that "a citizen of one State can sue a corporation which has been created by, and transacts its business in another State, although some of the members of the corporation are not citizens of the State in which the suit is brought, and although the State itself may be a member of the corporation." And that "a corporation created by, and transacting business in a State, is to be deemed an inhabitant of the State, capable of being treated as a citizen for all purposes of suing and being sued, *and an averment of the facts of its creation, and the place of transacting business, is sufficient to give the Circuit Court jurisdiction.*"

The case of *Marshall* v. *The Baltimore and Ohio Railroad Company*, 16 Howard, 314, decided in 1853, reviews, affirms and enforces the former adjudications. It settles that "a citizen

[Killpatrick *v.* Frost et al.]

of Virginia may sue the Baltimore and Ohio Railroad Company in the Circuit Court of the United States for Maryland, and an averment that the defendants are a body corporate, created by the Legislature of Maryland, is sufficient to give the court jurisdiction."

In this case, at page 327, Judge Grier says : " The necessities and conveniences of trade and business requires that such numerous associates and stockholders should act by representation, and having the faculty of contracting, suing and being sued in a fictitious or collective name. But these important faculties, conferred on them by state legislation, for their own convenience, cannot be wielded to deprive others of acknowledged rights. It is not reasonable that those who deal with such persons, should be deprived of .a valuable privilege, by a syllogism, or rather sophism, which deals subtly with words and names, without regard to the things or persons they are used to represent.

" Nor is it reasonable, that representatives of numerous, unknown, and ever-changing associates, should be permitted to allege the different citizenships of one or more of these stockholders, in order to defeat the plaintiff's privilege."

" It is true that these stockholders are corporators, and represented by this 'juridical person,' and come under the shadow of its name."

" But for all the purposes of acting, contracting, and judicial remedy, they can speak, act, and plead only through their representatives and curators."

In this case, as appears in the opinion of Justice Grier at page 325, the declaration averred " that the plaintiff is a citizen of Virginia, and that the Baltimore and Ohio Railroad Company, the defendant, is a body corporate, by an Act of 'the General Assembly of Maryland.'" The court decides that whether the averment is sufficient in law, is merely a question of pleading ; that if the declaration sets forth facts from which the citizenship of the parties may be presumed or legally inferred, it is sufficient, and that the averment, in this case, is sufficient, and vests jurisdiction in the Circuit Court of the United States.

The case of the *Lafayette Insurance Company* v. *French et al.*, 18 How. 404, was decided in 1855. At page 405, Justice Curtis, who gives the opinion, says : " In the declaration, the plaintiffs are averred to be citizens of Ohio, and they complain of the Lafayette Insurance Company, a citizen of the State of Indiana." This averment is not sufficient to show jurisdiction. It does not appear from it, that the Lafayette Insurance Company is a corporation, or if it be such, by the laws of what State it was created. The averment that the company is a citizen of

the State of Indiana, can have no sensible meaning attached to it. This court does not hold, that either a voluntary association of persons, or an association into a body politic, created by law, is a citizen of a State, within the meaning of the constitution. And, therefore, if the defective averment in the declaration had not been otherwise supplied, the suit must have been dismissed. But the plaintiffs' replication alleges that the defendants are a corporation, created under the laws of the State of Indiana, having its principal place of business in that State. These allegations are confessed by the demurrer, and they bring the case within the decision of this court in *Marshall* v. *The Baltimore and Ohio Railroad Company*, 16 How. 314, and the previous decisions therein referred to. The case therefore rules "that the assignment is sufficient."

In the case of the *New York and Erie Railroad* v. *Shepard and Shepard*, 5 McLean, 455, the declaration states: "The New York and Erie Railroad, doing business, and resident in the State of New York, plaintiffs, complain," &c. The defendants demurred, on the ground that there was no sufficient allegation of citizenship, to prove jurisdiction in the court. Judge McLean ruled, that "where a corporation of another State sues in this court, an allegation of citizenship is not now necessary, as was formerly required. The State where the corporation is located, and in which its corporate functions are exercised, as alleged, is sufficient to give jurisdiction." He therefore overruled the demurrer.

In the case of *Wheeden* v. *The Camden and Amboy Railroad and Transportation Company*, 1 Grant's Cases, 420, Judge Woodward, of this court, ruled that a corporation is not *per se*, a citizen, within the meaning of the third section of the constitution of the United States. But when sued, if the governing officers, the substantial parties, are citizens of the State which created the corporation, and the other party is a citizen of another State, the Federal courts have jurisdiction."

These decisions forced the plaintiff to admit, "that a corporation aggregate averred of record to have been created by the laws of New York, and to have its principal place of business there, can sue a citizen of Pennsylvania, in the Circuit Court of the United States." In this case, it is not only averred of record that the "complainant, the Buffalo and State Line Railroad Company, is a body politic and corporate, created by, and duly organized under the laws of the State of New York, and doing business therein;" that "the Erie and North-East Railroad Company is a body politic, created and organized under the laws of Pennsylvania, and being situated and doing business in said State;" that "the city of Erie is a municipal corporation, created by the commonwealth of Pennsylvania, and situated therein;"

[Killpatrick *v.* Frost et al.]

that "John Killpatrick is a citizen and resident of Pennsylvania, and is made a defendant hereto," but in addition to these allegations, charges, in apt and proper form, the combination of the defendants to prevent and hinder the Erie and North-East Railroad Company from carrying out its agreement with the Buffalo and State Line Railroad Company.

But, notwithstanding the above and other averments of record, and the admission of the party, the plaintiff insists that the Circuit Court had not jurisdiction in the premises, because the record does not show that the amount in controversy exceeded $500.

To sustain this position, he relies upon the 11th section of the Act of Sept. 24th, 1789, on the decisions in Wash. C. C. Rep. 624, and 1 Paine, 586. The section relied on, says : " The Circuit Court shall have original cognizance concurrent with the courts of the several States, of all suits of a civil nature, at common law or in equity, where the matter in dispute exceeds, exclusive of costs, the sum or value of $500 ; and the suit is between a citizen of the State where the suit is brought, and a citizen of another State."

The cases of 4 Wash. and 1 Paine, though they appear to sustain the plaintiff's position, yet, as explained by subsequent decisions, they do not. In the case in 4 Wash., there was no averment that the land in suit was of any value. This case was brought to the consideration of the Supreme Court, in the year 1833, in *Ex parte Bradstreet*, 7 Peters, 634. It was a writ of right for lands lying in the northern district of the State of New York. Neither in the writ nor in the counts, was there an averment of the value of the premises being sufficient in amount to give the court jurisdiction. The defendants appeared and moved the court to dismiss the cause for want of jurisdiction. The motion was granted. The plaintiff applied to the Supreme Court for a *mandamus*. The *mandamus* was granted. In doing so, Chief Justice Marshall, who gave the opinion, says: " In cases when *the demand is not for money*, and the nature of the action does not require the value of the thing demanded to be stated in the declarations, the practice of this court, and of the courts of the United States, is, to allow the value to be given in evidence. In pursuance of this practice, the demandant in the suits, dismissed by order of the judge of the District Court, had a right to give the value of the property demanded in evidence, at or before the trial of the cause, and would have a right to give it in evidence in this court. Consequently, he cannot be legally prevented from bringing his case before this tribunal. The court doth therefore direct, that a *mandamus* be awarded to the judge of the District Court of the United States for the Northern District of New York, requiring the said judge

[Killpatrick *v.* Frost et al.]

to reinstate, and proceed to try," &c.   In the *mandamus* the decision in 4 Wash., is considered.

This adjudication in 7 Peters, settles, that there need not be an averment of the amount, in cases "*when the demand is not for money*" or where "*the nature of the action does not require the value of the thing demanded to be stated in the declaration.*" The words of the Statute of 1789, quoted, would appear distinctly to indicate that an averment of the amount need be made, only where the "*matter*" in dispute exceeds the "*sum*" of $500.   The Buffalo and State Line Railroad Company, did not demand or seek to recover from the city of Erie, John Killpatrick, or any of the other defendants, any sum of money.   The object of the bill was, to enjoin the defendants from preventing the Erie and North-East Railroad Company carrying out, in good faith, the agreement with the complainants.   Whether that agreement was right or wrong, did not and could not affect the question of jurisdiction.   The parties had a legal right to make the agreement.   The Act of April 11, 1853, authorized the Erie and North-East Railroad Company, at the pleasure of its directors, to change the gauge of the road.   Neither the city of Erie, nor John Killpatrick, nor any other person, had the legal right, by force and violence, to prevent the change.   The complainants had the right to seek redress in equity, to pray that court to restrain the defendants from the commission of wanton violence.   But whether the parties had a legal right to make the contract or not, whether it was a judicious or proper one or not, the Circuit Court had the right to entertain the bill and adjudicate upon it.

The Supreme, Circuit, and District Courts of the United States have equity jurisdiction; the proceedings in this case were in equity.   Unless the bill is filed for the recovery of money, or is of that character of action, there is, and can be, no sum demanded.   The words "matter in dispute," as found in the Act of 1789, particularly as connected with the words, "the sum of five hundred dollars," indicate that that act was not passed with any reference to the jurisdiction in equity of the Circuit Court, unless when that court, on its equity side, is appealed to for the recovery of money or property.

Bills in equity, instituted in the Circuit Court of the United States, not to recover money or property, but like this, to restrain from the commission of some threatened or executed act of violence or wrong, never aver the amount in controversy. They cannot, for there is no amount or sum in controversy.

This construction of the words of the Act of 1789, is strengthened by the nature of a bill in equity not to recover money or property; for in a bill to restrain, there can, from its very nature, be no sum in dispute.   It is also sustained by the deci-

sion in 7 Peters, which says, "where the demand is not for money," and "where the nature of the action does not require the value of the thing demanded to be stated in the declaration," there need be no averment of the amount. It is also sustained by the decision in 7 Peters, which decides, that even in those cases where the demand is money or property, and where the nature of the action requires the value of the thing demanded to be stated, yet if it is not stated it may be shown upon the trial, and it is error to dismiss the suit for want of that averment.

It is next insisted upon by the plaintiff, in his argument, that the Circuit Court had no jurisdiction, because "the Erie and North-East Railroad Company, is really a joint plaintiff in interest" with the Buffalo and State Line Railroad Company. He cites 1 Cranch, 61, 303; 3 Id. 267; 2 Whart. 91; 14 Peters, 60, and Conk. Treat. 147, 152, 161, to sustain him.

In answer, let us ascertain, if we can, whether the plaintiff is correct in his assertion that the Erie and North-East Railroad Company *is really a joint plaintiff.*

The bill, as will be seen by an inspection of it, makes the Buffalo and State Line Railroad Company the plaintiff, and the Erie and North-East Railroad Company a defendant. Then the bill on its face negatives the plaintiff's assertion. Nor does it sustains the plaintiff in his assertion that "the making the Erie and North-East Railroad Company a nominal defendant, is colorable and not real—*a transparent mockery.*"

The authorities relied upon by the plaintiffs, do not apply to our case. That of *Strowbridge et al.* v. *Curtis et al.,* 3 Cranch, 267, decided in 1806, rules, "That if there be two or more joint plaintiffs, and two or more joint defendants, each of the plaintiffs must be capable of suing each of the defendants in the courts of the United States, to sustain the jurisdiction of the court." The bill set forth, that some of the complainants were citizens of Massachusetts; that all the defendants, except Curtis, who was averred to be a citizen of Vermont, were citizens of Massachusetts. The judge, C. J. Marshall, disposes of it in these words: "The court has considered this case, and is of opinion that the jurisdiction cannot be supported."

The authority in 5 Cranch, 61, *United States Bank* v. *Devereux et al.,* does not appear to have any application to the point raised. In that case, the defendants pleaded that the Bank of the United States was not "a citizen within the meaning of the Constitution, and could not maintain a suit in the Circuit Court of the United States. The court sustained the plea. The suit was removed, by error, to the Supreme Court, where, after a full argument, the court decided that the plea was not good— that "a corporation aggregate, composed of citizens of one

[Killpatrick *v.* Frost et al.]

State, may sue a citizen of another State in the Circuit Court of the United States."

The case in 14 Peters, 60, *The Commercial and Railroad Bank of Vicksburg* v. *Slocum et al.*, is no authority for the plaintiff. It was this, Slocum *et al.*, styling themselves citizens of Louisiana, sued the Commercial and Railroad Bank of Vicksburg, as citizens of the State of Mississippi. The defendants pleaded that two of the defendants, naming them, were citizens of Louisiana. To this the plaintiffs demurred. The demurrer was sustained. The defendants removed the suit to the Supreme Court, where the plea was sustained.

It is, then, on this point insisted, that the plaintiff has entirely failed to show that the Erie and North-East Railroad Company is a joint plaintiff with the Buffalo and State Line Railroad Company. It is also insisted that his authorities have no application to the facts as they appear in the bill.

The next position taken by the plaintiff in error is, "that the whole proceeding was *coram non judice;* the process a nullity; and the officer executing it a trespasser."

So far as relates to the proceedings being *coram non judice,* and the *process a nullity,* nothing further need be said.

That the officers who executed the process were trespassers, is denied. The plaintiff admits they were not, if the Circuit Court had jurisdiction in the premises. That it had, we think, is evident from an inspection of the bill; from all the facts of the case; from the argument made on that part of the case, and from the authorities adduced.

But for executing the process in this case, were the defendants trespassers? To show that they were, the plaintiff relies upon the case of *Wise* v. *Withers,* 3 Cranch, 331. That was an action of trespass *vi et armis,* for entering the plaintiff's house, and taking away his goods. The defendant justified as collector of militia fines. The court decided, that the plaintiff, "a justice of the peace, within the District of Columbia, is exempt from the performance of militia duty;" "that a court-martial has no jurisdiction over a justice of the peace, as a militia man;" that "he could never be legally enrolled," and that "it is a principle that a decision of such a tribunal, in a case clearly without its jurisdiction, cannot protect the officer who executes it."

The plaintiff also relies upon the case of *Smith* v. *Shaw,* 12 Johns. 257. This was the case: Shaw brought an action of assault and battery, and false imprisonment, against Smith. The facts were, that Shaw was arrested by two men, (Hopins and Findley,) and carried to Sackett's Harbor, and confined in the guard-house. Smith, who was the commanding officer, and had the right to discharge Shaw, refused to do so, but remand-

[Killpatrick *v.* Frost et al.]

ed him to the guard-house, until his commanding officer should return to Sackett's Harbor. Shaw was afterwards dismissed. It was for this arrest and imprisonment that the suit was brought. The court decided, "that (Shaw, the plaintiff,) a citizen of the United States, not in the military service, was not amenable to a court-martial." That "where a person, not subject to the jurisdiction of a court-martial, is arrested and detained for trial for an offence not within their jurisdiction, not only the persons making the arrest. are trespassers, but a commanding officer who ratifies and affirms their acts, or himself undertakes to exercise restraint over the plaintiff, is subject to an action." That "where the subject-matter of the suit is not within the jurisdiction of a court, all the proceedings are absolutely void, and the officer, as well as the party, is a trespasser."

"But when the subject-matter is within the jurisdiction of the court, and the want of jurisdiction is to *the person or place*, then the officer is excused, unless the want of jurisdiction appears in the process."

The plaintiff cites 5 Wend. 130, 131. There is no case there on this point; but I find at page 231, the case of *Wilcox* v. *Smith*, in which it is decided, "that a *constable* is justified in executing process regular on its face, although the officer issuing such process be but an officer *de facto*." "Evidence establishing the fact, that the officer issuing the process is an officer *de facto*, is not merely *prima facie* evidence that he is an officer *de jure*, but it is conclusive evidence for the protection of a ministerial officer required to execute such process."

There is, in the same book, 5 Wend. 170, the case of *Savacool* v. *Boughton*, which decides, that " a ministerial officer is protected in the execution of process, whether the same issue from a court of *limited* or *general* jurisdiction, although such court have not, in fact, jurisdiction in the case ; provided, that on the face of the process, it appears that the court has jurisdiction of the subject-matter, and nothing appears in the same to apprise the officer, but that the court also has jurisdiction of the person of the party to be affected by the process."

In the same book, 5 Wend. 241, is the case of *M'Guinty* v. *Herrick*, in which it is decided, at page 245, that "where the process is regular upon its face, and issued from a court having jurisdiction of the subject-matter, the officer who executed it would be protected, but the party who acted knowingly, would be a trespasser."

*Lewis* v. *Palmer*, 7 Wend. 367, decides, "that a justice of the peace, who issues an execution without authority, and the plaintiff who procured it to be issued, after his debt had been paid, are trespassers, but the officer, (the constable,) who acted by virtue of process, regular upon its face, issued by a magis-

[Killpatrick *v.* Frost et al.]

trate who had jurisdiction of the subject-matter, and of the process of execution, was justified in executing it." "That it is the duty of a constable to execute process, regular upon its face, and within the legitimate power of the officer issuing it, without first inquiring into the regularity of the previous proceedings."

In *Coon* v. *Congden*, 12 Wend. 496, which was a replevin for two horses, sold by the defendant, (a constable,) on an execution issued by a magistrate, it is decided, " that a justice's execution, regular upon its face, is sufficient to protect the officer executing the process, whether the magistrate had or had not jurisdiction of the case in which the process issued."

In *Parker* v. *Walrod*, 16 Wend. 514; in *Sheldon* v. *Von Buskirk*, 2 Com. 493; and in *Wilber et al.* v. *Gay et al.*, 24 Wend. 484; it is decided, "that a ministerial officer, who executes the process of an officer or court, having jurisdiction of the subject-matter, and the power to issue the process, is protected in the execution thereof, if the process is regular upon its face, and apparently within the jurisdiction of the officer or court issuing the same." " That if the want of jurisdiction appears upon the face of the writ, the officer is not protected, nor would he be protected when the want of jurisdiction arises from a fact of public notoriety, which could legally be presumed to be within his knowledge." " That if the justice has jurisdiction of the subject-matter, and if the process is regular upon its face, the officer is protected." " That to go beyond this, would lead to new and troublesome issues, which would tend greatly to weaken the reasonable protection of ministerial officers." " To require them to act or not, at their peril, as they may be supposed to know or not, the technical regularity of the party or magistrate, is against the reason and policy of the rule."

In *Horton* v. *Hendershot*, 1 Hill, 118, the same is decided. *The People* v. *Warren*, 5 Id. 440, goes farther. It was a *certiorari* to reverse a conviction for disturbing an election. The court decided, " that a warrant, regular upon its face, is sufficient authority to make the arrest, and the defendant had no right to resist the officer." " The knowledge of the officer that the inspectors had no jurisdiction, is not important. He must be governed, and is protected, by the process, and cannot be affected by anything which he has heard or learned out of it."

*Dominick* v. *Eacker and Powell*, 3 Barb. 17. This was an action for an assault and battery and false imprisonment. Eacker was the plaintiff in a judgment against Dominick. He issued a *ca. sa.*, directed to the sheriff. Powell, as deputy sheriff, arrested Dominick. The execution had an improper seal to it. The suit was for that arrest. The court decided " that the execution

[Killpatrick *v.* Frost et al.]

was a good protection to the officer, and to the party, until set aside." "That defects in process which are *amendable*, and which do not render it absolutely bad, though apparent on its face, do not render the officer or party liable. It is only jurisdictional defects, and such as cannot be amended, which render the officer liable, when they are apparent on the face of the process." "The apparent defects, which leave the officer without protection, are such as apprise him of a want of jurisdiction in the court issuing the process, either over the subject-matter, or the person of the defendant."

In *Allison* v. *Rheam*, 3 S. & R. 139; *Hecker* v. *Jerrell*, 3 Bin. 404; *Kingsbury* v. *Ledyard*, 2 W. & S. 37; the doctrine is maintained that an execution, regular upon its face, and issued from a court having jurisdiction, is a full protection to the officer·; that where an erroneous judgment is entered, it is the error of the court and·not of the party. It is good in law until reversed, and everything done under it before reversal, is valid.

The plaintiff, in his argument, contends that if the Circuit Court had jurisdiction, and if the process afforded a protection to the marshal, it does not follow that it protected Sproul and Reynolds. The evidence shows that Sproul was the general deputy of the marshal, and that Reynolds was deputed specially in that case. It is contended that the process protected alike all the defendants. This is settled in many cases. In *Elder* v. *Morrisson*, 10 Wend. 139, it is decided that "whenever a sheriff or constable has power to execute process in a particular manner, his authority is a justification to himself, and all who come to his aid."

It is certainly not the law, as contended for by the plaintiff that a marshal, sheriff, or constable must show, in an action for false imprisonment against them, in addition to the judgment and execution issued thereon, and their commission or appointment, and that they were acting as such officers, that all the minor and particular requisitions provided for in Acts of Assembly, have been complied with. The statutory provisions as to giving security, placing the commission on record, taking the prescribed oath, &c., are intended for the security of suitors, and for the purity of the office.

The plaintiff further contends, that the court committed "a remarkable error" in charging: "We do not determine whether in abstract principle, the Circuit Court of the United States, had jurisdiction or not, but simply that the court exercised the jurisdiction, and as far as this court is concerned," have decided it, and that is conclusive.

Now, without admitting or denying, that the Court of Common Pleas of Erie county, can legally inquire into, and decide whether the Circuit Court of the United State had jurisdiction in suits

[Killpatrick *v.* Frost et al.]

before it, it is contended that, *in this case*, with all the evidence that was before the court, the judge could not decide that the Circuit Court had not jurisdiction. The fair construction of the charge is, that from the facts before the court, the decision of the Circuit Court must be taken as conclusive. The judge did not say that, in no case can the jurisdiction of one court be inquired into by another. He only said, what every lawyer must say, that in the case as presented, the adjudication of the Circuit Court, must be taken as conclusive. The case cited (1 Peters, R. 340,) is not inconsistent with this. In that case, the right of the judge of the County Court of Kentucky, to make the order complained of, was distinctly brought before the court, and it was made apparent that the court had not the jurisdiction exercised. But that decision does not sustain the plaintiff, first, because the court had jurisdiction, in which case the decision "*until reversed,*" is binding in every court; and second, because the jurisdiction can be inquired into in another court only, "when the proceedings of the former court are relied on, and brought before the latter court, by a party claiming the benefit of such proceedings." That was not the case before the court. The defendants did not claim the *benefit* of that adjudication, in the sense in which the word is used by the judge.

Opinion, Jan. 2, 1859.

PER CURIAM.—We cannot doubt that the case in the District Court of the United States, out of which the present one arose, was within the judicial competence of the court, both as respects the parties to it and the subject-matter. The competence of the court for the case, does not depend upon the description of the parties as belonging to the different States, but upon the fact that they do so; and if this were otherwise, the description is sufficient, according to the recognized practice of the Federal courts. The process on which the marshal acted, was therefore sufficient for his protection, and that of the other defendants who assisted him. The action is a joint one against all the defendants, for the one act of arrest and imprisonment, and that act being justified by the marshal, is justified for the other defendants, and these others did not need to prove any formal deputation. We do not inquire whether the marshal had fully proved that he had conformed to all the directions of the law; that was required before he entered upon the duties of his office; for having shown his commission, and also his recognition as marshal by the Federal courts, we presume that he has in other respects, conformed to the law, so far as conformity is essential to the offering of his commission.

Judgment affirmed, and record remitted.